UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

US HEALTH PHARMACEUTICALS D/B/A
MEDS DIRECT, GREATER LAKES AMBULATORY
SURGICAL CENTER, LLC and TOX TESTING, INC.
D/B/A PARAGON DIAGNOSTICS,

    Plaintiffs,                                          Case No. 20-10348

v                                                                    Hon.

ALLSTATE INSURANCE COMPANY,
ALLSTATE FIRE CASUALTY AND
INSURANCE COMPANY; ALLSTATE
PROPERTY AND CASUALTY INSURANCE
COMPANY; ESURANCE INSURANCE
COMPANY; ESURANCE PROPERTY AND
CASUALTY INSURANCE COMPANY;
ENCOMPASS INSURANCE COMPANY,

    Defendants.

---

AKEEL & VALENTINE, PLC
SHEREEF H. AKEEL (P54345)
ADAM S. AKEEL (P81328)
Attorneys for Plaintiffs
888 West Big Beaver Road, Suite 420
Troy, MI 48084
(248) 269 9595
shereef@akeelvalentine.com
adam@akeelvalentine.com

---

## COMPLAINT AND JURY DEMAND

**NOW COMES**, Plaintiffs, US HEALTH PHARMACEUTICALS D/B/A MEDS DIRECT, GREATER LAKES AMBULATORY SURGICAL CENTER, LLC, AND TOX TESTING, INC. D/B/A PARAGON DIAGNOSTICS, by and through their attorneys, AKEEL & VALENTINE, PLC, and state as follows:

## NATURE OF THE CASE

1.     Plaintiffs, Us Health Pharmaceuticals D/B/A Meds Direct ("Meds Direct"), Greater Lakes Ambulatory Surgical Center, LLC ("GLASC"), and Tox Testing, Inc. D/B/A Paragon Diagnostics ("Tox Testing" or "Paragon") (collectively referred to as the "Clinics" or "Providers"), bring this action against Defendant, Allstate, its affiliates and subsidiaries seeking redress for the illegal acts, which has resulted in a loss of their property and a detriment to their businesses, and for declaratory and injunctive relief to end those practices and prevent further losses.

2.     This Complaint is based on the relationship Defendants have with medical providers, such as the Clinics, rather than on the relationship between Defendants and their insureds.  However, Plaintiffs are also motivated by their belief that Defendants' scheme is harmful to the health of their patients and to the welfare of the people of the State of Michigan.  By taking funds that have been rightfully earned by medical providers and diverting them to their own use, Defendants, and their accomplices and co-conspirators deprive medical providers of the adequate and timely payments they need to treat patients and maintain their practices.

3.     As further described below, the premise of the relationship between Defendants and the medical providers is that the medical providers will be paid, voluntarily, and in a timely manner in accordance with the Michigan No-Fault Act, being MCL §3101, *et seq.*, for the medically necessary services they render.

4.     Allstate, as part of a common scheme with its accomplices, co-conspirators, subsidiaries, and affiliates (including Esurance and Encompass), utilized an unlawful pattern of processing claims submitted by or through the Clinics to systematically and automatically delay and deny payments owed to the Clinics, which exceed 5 million dollars,  in violation of the Michigan No Fault Act, being MCL §3101, *et seq.* (the "Act").

5.     This is an action whereby Plaintiffs seek judicial redress against Defendants in the form of declaratory relief, injunctive relief, damages, treble damages, costs and attorney fees for denying, or causing to be denied, certain insurance claims and refusing payments regarding the same for impermissible, illegal, and unconscionable reasons.  This concerted scheme to injure Plaintiffs in both their businesses and properties involved numerous instances of false and fraudulent objection letters, investigative letters, denial letters, and explanations of benefits ("EOB") submitted through the United States mail, thereby constituting mail fraud.  These actions render Defendants liable for damages and other relief

3

under the Racketeering Influenced Corrupt Organization Act, 18 U.S.C. §1961, *et seq.* ("RICO").

6.     To date, and upon information and belief, Defendant Allstate has not voluntarily paid a single claim to Plaintiffs since 2016  (or earlier) despite submission of hundreds of valid claims for payment, thus, compromising many of Allstate's insureds' quality of care, as well as Plaintiffs' abilities to continue to operate their businesses.

7.     Similarly, Encompass and Esurance have delayed and/or denied every, or nearly every, claim submitted by Plaintiffs since as early as 2016/2017.

8.     As a consequence, Plaintiffs routinely have had to resort to litigation to obtain any sum of money from Defendants for reasonable and necessary medical services rendered to Defendants' insureds.

9.     Plaintiffs assert this RICO complaint against Defendants, Allstate, Esurance, and Encompass, seeking treble damages for the harm sustained by Plaintiffs in their businesses and properties, as a result of Defendants' pattern of racketeering since as early as 2016 (or earlier) to present.

10.     Plaintiffs further seek both declaratory and injunctive relief against Defendants to have this Honorable Court enjoin the illegal and fraudulent claim handling procedures of Defendants and its co-conspirators and accomplices, and to enjoin their engagement in the same.  Persons injured in automobile accidents in this

4

State are entitled to know that they are permitted to select properly licensed medical professionals of their own choice, and that such selections will not in any way deprive them of any rights or benefits that they may have under the Act.

## PARTIES

11.     Allstate Insurance Company, Allstate Fire Casualty Insurance Company, and Allstate Casualty Insurance Company (hereinafter collectively referred to as "Allstate"), respectively, were, at all relevant times, authorized, participated and/or engaged in the business of insurance, including selling automobile insurance within the State of Michigan.  Allstate is one of the largest insurance providers in the United States and one of the largest that is publicly held. It was ranked No. 79 in the 2018 Fortune 500 list of the largest United States corporations by total revenue.  ("Fortune 500 Companies 2018: Who Made the List". Fortune.  Retrieved  2018-11-10;  http://fortune.com/fortune500/list/).    In  fact, Defendant Allstate's annual revenue exceeds $40 billion.

12.     Allstate has permanent, continuous, and regular contacts with the State of Michigan.

13.     Esurance Insurance Company and Esurance Property and Casualty Insurance Company (hereinafter collectively referred to as "Esurance"), respectively, were, at all relevant times, authorized, participated and/or engaged in

the business of insurance, including selling automobile insurance within the State of Michigan.

14.    At all relevant times herein, Esurance was owned by Allstate.

15.    Esurance has permanent, continuous, and regular contacts with the State of Michigan.

16.    Encompass Insurance Company ("Encompass") was, at all relevant times, authorized, participated and/or engaged in the business of insurance, including selling automobile insurance within the State of Michigan.

17.    At all relevant times herein, Encompass was owned by Allstate.

18.    Encompass has permanent, continuous, and regular contacts with the State of Michigan.

19.    Plaintiff, Greater Lakes Ambulatory Surgical Center, LLC ("GLASC"), is a Michigan corporation with its principal place of business located at 16100 19 Mile Road, Suite 300, Clinton Township, Michigan.

20.    GLASC provides independent physicians a state-approved surgical facility – as an alternative to a hospital – to provide reasonable and necessary medical services, including surgery for their patients.

21.    Plaintiff, Meds Direct ("Meds Direct"), is a Nevada corporation with its principal place of business at 16100 19 Mile Rd., Clinton Township, MI 48038.

22.    Meds Direct serves people with prescriptions for medications.

23.     Plaintiff, Tox Testing Inc. ("Tox Testing") is a Delaware corporation with its principal place of business at 16100 19 Mile Rd., Clinton Township, Michigan 48038.

24.     Tox Testing provides a facility for patients to submit urine samples to be analyzed in a medical laboratory.

25.     At all relevant times herein, Plaintiffs provided reasonable and necessary medical services to Defendants' insureds for automobile-related injuries.

## JURISDICTION AND VENUE

26.     Pursuant to 28 U.S.C. §1332(a)(1), this Court has jurisdiction over the subject matter of the controversy between the parties by virtue of their being diversity between the parties and the amount in controversy being in excess of $75,000 excluding costs and interest.

27.     This Court also has federal question jurisdiction pursuant to 19 U.S.C. §1964.

28.     Venue is proper in this district because a substantial part of the events or omissions that give rise to the claims occurred here.

## FACTUAL ALLEGATIONS

### A. McKinsey Consulting Changes Culture of Allstate

29.     By way of background, in or around the mid-1990s, Allstate hired McKinsey Consulting ("McKinsey"), a management consulting firm that specializes

in advising companies how to change their processes and shift their corporate cultures so to improve performance and maximize corporate profits. (**Ex. A** – *An insurer in the grip of greed*).

30.    As a consulting firm, McKinsey sought to aid Allstate in acquiring long-term change by implementing processes that would gradually shift the mindset and culture of Allstate so to maximize profits for shareholders and executives, often at the expense of policyholders and medical providers, as will be discussed below.

31.    As explained by McKinsey, McKinsey's approach to transform corporate culture and maximize long-lasting change is done in a three step "Integrated transformation approach": 1) Top-down directional changes; 2) Bottom-up performance-improvement changes; and 3) Core process redesign. (see McKinsey Articles: **Ex. B** – *Culture and Change*; **Ex. C** – *Leading organizational transformations*; **Ex. D** – *Elephant in the room: making a culture transformation stick with symbolic actions*; **Ex. E** – *Five cultural changes you need for DevOps to work*; **Ex. F** – *The psychology of change management*; **Ex. G** –*Want to reinvent your business? Start with culture*).

32.    Throughout the years, McKinsey has teamed up with large insurance companies, including Allstate, to implement this approach in order to further its goals, as well as to aid such insurance companies to discover ways to maximize their profits – even if the methods used compromised duties owed to those they insure.

(**Ex. H** – AAJ Article – "*The Ten Worst Insurance Companies in America*"; **Ex. I** – Huffington Post – "*Insurance Claim Delays Deliver Massive Profits to Industry by Shorting Customers*"; **Ex. J** – "*McKinsey Advised Johnson & Johnson on Increasing Opioid Sales*").

33.     As will be discussed, McKinsey implemented this approach at Allstate, and successfully shifted Allstate's corporate culture away from one centered on its fiduciary duty to policyholders, to one centered on maximizing profits for its shareholders and executives at the expense of its policyholders and medical providers.[1]

34.     Allstate, with the counsel and aid of McKinsey, adopted and implemented a company-wide policy, known as Claim Core Process Redesign (CCPR), which was a redesign to the structure of how Allstate processes and assess claims submitted by its insureds (or medical providers, on behalf of those insureds).[2]

35.     As further explained below, it is this corporate alliance between McKinsey, Allstate, and others that led to the culture transformation within Allstate - which has spanned many years - in the handling of its auto claims, and in the

---

[1] Of note, McKinsey Consulting has also become known for providing management consulting advice to many infamous companies caught for engaging in unethical business practices such as Enron, and Purdue Pharma – a company heavily linked with allegedly furthering the opioid crisis.

[2] *Jacobsen v. Allstate Ins. Co.*, 2005 WL 8156366 (Mont. 2005) (**Ex. K** – Unpublished Cases; *Jacobsen v. Allstate Ins. Co.*, 371 Mont. 393 (Mont. 2013); *Louisiana ex rel. Caldwell v. Allstate Ins. Co.*, 536 F.3d 418, 422 (5th Cir. 2008).

wrongful delay and/or denial of valid claims submitted by medical providers like Plaintiffs.

36.     The express purpose and goal of the CCPR was to increase Allstate's profit margin by changing claim adjustment practice and procedures. *Jacobsen v. Allstate Ins. Co.,* 2005 WL 8156366 (Mont. 2005).

37.     McKinsey and Allstate designed the CCPR as a profit generating scheme designed to divert money from the insurance trust fund of policyholder premiums held by Allstate to satisfy legitimate claims in order to generate excess illicit claims profit without regard to the merits of the claims being made. *Jacobsen v. Allstate Ins. Co.,* 2012 WL 13070883 (Mont. 2012).

38.     CCPR incorporated a new system of adjusting insurance claims, referred to as the "three D'" – *delay* the claim, *deny* the payment, and then do anything to *defend* against the lawsuit. (**Ex. H**, p. 11; **Ex. L**– *Delay, Deny, Defend: How Auto Accident Claims Drive up Profits for Insurance Companies*; **Ex. M**, *Delay, Deny, Defend: Why Insurance Companies Don't Pay and What You Can do About it*).

39.     This system was designed to permit insurance companies, like Allstate, to delay, not fully pay or pay at all, and/or just arbitrarily deny coverage for an insured's injuries, leading some to file lawsuits and settle for a reduced amount due to the undue hardship they endure during the pendency of their claims for benefits.

40.     This became known as the "delay, deny, defend" strategy.

41.     Upon information and belief, this method and other deceptive tactics (as will be discussed below) have been used by insurance companies, including Allstate, Esurance and Encompass, to reduce the amounts of claims paid, irrespective of whether a certain claim is valid or not.

42.     The CCPR was a system designed and based on a "*Zero Sum Game theory*" which "pit[s] Allstate and its shareholders against its policy holders for share of the [insurance] claim fund." *Jacobsen v. Allstate Ins. Co.,* 2012 WL 13070883 (Mont. 2012).

43.     The purpose of implementing the CCPR was to improve Allstate's shareholder profits at the expense of medical providers, plaintiff attorneys, and claimants. *Jacobsen v. Allstate Ins. Co.,* 2012 WL 13070883 (Mont. 2012).

44.     The CCPR involved an elaborate claim processing system that necessitated the establishment and coordination of an enterprise designed to pursue the common goal of maximizing profits for Allstate, its shareholders and its executives.

45.     The claim processing system, designed and implemented by Allstate and McKinsey, necessitated the formation of a partnership between Allstate and various entities that would work in unison to achieve Allstate's objectives of

maximizing profits at the expense of policyholders and medical providers, such as Plaintiffs.

46.     As more fully described below, through the counsel and aid of McKinsey, Allstate created an elaborate claims processing enterprise, known as the Core Claims Process Redesign Enterprise ("CCPR Enterprise") that involved/involves coordinated effort of the following entities and individuals: 1) Computer Sciences Corporation ("CSC"); 2) Mitchell International; 3) executive management; 4) claim adjusters; 5) IME companies, and 6) law firms.  The role of each member of the CCPR Enterprise is described below.

### B. <u>Computer Sciences Corporation</u>

47.     A key element of CCPR known as "Colossus", was a program developed and obtained by or leased to Allstate by Computer Sciences Corporation ("CSC").  *Jacobsen v. Allstate Ins. Co.,* 2012 WL 13070883 (Mont. 2012).

48.     During the time in which Allstate implemented Colossus, CSC marketed the tool as "the most powerful cost saving tool" because it will allow insurers to immediately reduce the size of bodily injury claims by up to 20%.  *Jacobsen v. Allstate Ins. Co.,* 2012 WL 13070883 (Mont. 2012).

49.     Colossus, or its successor, is a claims software program used by Allstate to manage personal injury claims.

50.     Upon information and belief, Allstate still uses Colossus, or a similar software program designed to allow Allstate to automatically and systematically process claims.

51.     Upon information and belief, CSC provides this tool – Colossus –  to insurers in order to allow them to systematically categorize claims and provide a maximum settlement value based on type of injury, and medical provider, rather than on the individualized nature of the specific claims.

52.     In other words, the tool provided by CSC to Allstate allowed Allstate to eliminate or reduce the ability for adjusters to make individualized determinations and assessments regarding the value of a claim or bill that is submitted.

53.     With the counsel and aid of McKinsey, Allstate solicited business of CSC and implemented Colossus to systematically reduce payments to policyholders without adequately examining the individualized nature of each claim. *Jacobsen v. Allstate Ins. Co.,* 2012 WL 13070883 (Mont. 2012); *Oakes v. Allstate Insurance Company,* 2008 WL 11363638 (W.D. Ky. 2008).

54.     With access and control of this automated system, Allstate has been able to program, manipulate, and automate its claim processing to further its objectives of maximizing profits for its shareholders and executives at the expense of policyholders and medical providers.

55.    Allstate's partnership with CSC was one of several steps needed to establish the CCPR Enterprise.

## C. **Mitchell International**

56.    Another instrumental member of the CCPR Enterprise is Mitchell International, who was responsible for developing a software called Mitchell Decision Point ("MDP").

57.    MDP is a software that was licensed/or provided to Allstate and used by adjusters to organize and review submitted medical bills and claims.

58.    Importantly, one of the features of MDP was/is to flag certain bills belonging to certain providers for various reasons.

59.    Upon information and belief, Allstate and its executives use MDP (or a similar type of program) to identify and flag all bills submitted by certain medical providers, such as Plaintiffs, so to then subject every single one of those claims to a predetermined claim processing protocol established to delay and ultimately deny payment of those claims.

60.    With access and control of this automated system, Allstate has been able to program, manipulate, and automate its claim processing system to further its objectives of maximizing profits for its shareholders and executives at the expense of policyholders and medical providers.

61.    In other words, Allstate's partnership with Mitchell International was another necessary component for the establishment of the CCPR Enterprise.

**D. Changing the Culture of Allstate**

62.    With the implementation of MDP and Colossus, Allstate and McKinsey had in place an automated claims processing system that would eventually allow executive management and shareholders to systematically and prematurely dictate the settlement values of future claims submitted by those involved in automobile-related accidents, and also establish predetermined protocols in processing claims submitted by medical providers like Plaintiffs, as later described.

63.    With these programs in place, and in order to effectuate the goal of the conspiracy or scheme to maximize profit for shareholders at the expense of policyholders, Allstate and McKinsey then designed and implemented a performance evaluation process to change the culture of Allstate and shift the mindset of the claim adjusters away from one that was centered on an insurer-insured fiduciary relationship, towards one that would be focused on minimizing payouts to insureds and maximizing profits for the company.

64.    In doing so, Allstate recruited, hired, trained, and instructed its agents to alter their approach to handling claims, where the focus would be on minimizing claim payout to the maximum extent possible to achieve the goal of the CCPR Enterprise.  (**Ex. N** – *Consumer Federation of America: An Insider's Look at How*

15

*Some Insurers Can Manipulate Computerized Systems to Broadly Underpay Injury Claims*; **Ex O** – *Declaration of James Mathis*).

65.     For example, upon information and belief, to effectuate the goal of the CCPR Enterprise, Allstate trained its adjusters to: 1) initiate contact with the claimant as soon as possible, 2) gather as many facts as possible during the initial contact directly from the insured and before an attorney can be obtained; 3) place claims "under investigation"; 4) delay and/or only make partial payments, and/or 4) retain attorneys to aggressively contest claims submitted by insureds and/or medical providers.

66.     As stated, the main purpose of CCPR was to save money, pay less on claims, and create powerful incentives to employees to shift their conduct away from paying claims and towards maximizing profits for Allstate's shareholders and executive.  *Doan v. Allstate Ins. Co.,* 2008 WL 2223123 (E.D. Mich. 2008); *Jacobsen v. Allstate Ins. Co.*, 2012 WL 13070883 (2012).

67.     In order to ensure this, Allstate and McKinsey created and implemented a competitive performance management system that rid or minimized adjusters of their abilities to make independent determinations on a claim-by-claim basis, but to instead rely solely on whatever value Colossus generated.  Through Colossus, or Allstate's automated evaluation system, adjusters and representatives were/are provided a "loss valuation range". *Jacobsen v. Allstate Ins. Co.,* 2005 WL 8156366

(Mont. 2005). (**Ex. P** – *Affidavit of Shannon L. Brady Kmatz*; **Ex. Q** – *Affidavit of Linda F. Brow*).

68.    As part of the culture change, the loss valuation range for a particular injury was/is predetermined by Allstate's executive leadership based on profit goals that are preprogramed and adjusted in the automated evaluation system. *Jacobsen v. Allstate Ins. Co.,* 2005 WL 8156366 (Mont. 2005).

69.    Also, through use of rigorously competitive performance management techniques (such as requiring adjusters to compete with one another to settle claims at or below the loss evaluation range, while allowing adjusters to view one another's performance in real time), as well as implementation of incentives and bonuses for those that perform the best (by paying the least amount on claims), Allstate and McKinsey successfully shifted the culture of Allstate to one that is now encouraged and centered on maximizing profits for shareholders and executives at the expense of policyholders and medical providers.  The results of this culture change remains in effect today.

70.    With the automated claim systems (Colossus and MDP) in place, and with the claim adjusters working in pursuit of the CCPR Enterprise's goal, Allstate (with counsel and aid of McKinsey) then implemented vigorous litigation strategies, as described below.

### E. **Independent Medical Examinations**

71.     To further the purpose of the CCPR Enterprise, Allstate then began retaining certain independent medical examination ("IME") doctors and companies.

72.     Allstate pays these IME doctors and companies to justify denial or diminishment in payment on a particular claim.

73.     Whether such IME doctors and companies are *knowingly* complicit in Allstate's fraudulent conduct of denying and reducing claims without conducting a proper investigation is unknown.

74.     What is known however, is that such IME doctors and companies are part of the CCPR Enterprise and have worked with, and at the direction of Allstate, for many years to further the purpose of the enterprise.

75.     By retaining these doctors and companies, and incentivizing them to provide services in furtherance of Allstate's scheme to defraud, Allstate is able to control and direct the affairs of the CCPR Enterprise on an on-going basis to ensure conduct in conformity with the goals of the enterprise.

### F. **Law Firms**

76.     To further the purpose of the enterprise, and maximize profits for its shareholders and executives, Allstate (with the aid and counsel of McKinsey) solicited the business of select law firms and implemented a vigorous litigation strategy to use false pretenses to 1) minimize claim payouts to insureds, 2) justify

decisions to delay, deny and diminish payments, 3) deter plaintiff law firms from filing suit, and 4) target certain medical providers with lawsuits with the goal of putting them out of business or deter them from continuing to bill them or provide services to their insureds.

77. For example, in directing and furthering the goals of the CCPR Enterprise, and as part of this cultural change, Allstate retained attorneys and law firms to vigorously litigate on its behalf, while providing incentives and bonuses to law firms based on the number of cases those firms refuse to settle (irrespective of merit). *Doan v. Allstate Ins. Co.,* 2008 WL 2223123 (E.D. Mich. 2008). (**Ex. R** – *Affidavit of Maureen Reed, Esq.*).

78. Upon information and belief, Allstate also retains select law firms to aggressively pursue RICO claims against medical providers, such as Plaintiffs. Such efforts are used to intimidate medical providers, deter certain providers from continuing to provide treatment to Allstate's insureds, and cause them financial ruin. *State Fam Mutual Automobile Insurance Company v. Universal Health Group, Inc.,* 2015 WL 13620467 (E.D. Mich. 2015).

79. By deterring certain private medical providers from providing treatment to Allstate's insureds, Allstate's insureds are limited in their ability to choose their own provider.

80.    By retaining these law firms, and incentivizing them to provide relentless litigation services regardless of merit and in furtherance Allstate's scheme to defraud, Allstate is able to control and direct the affairs of the CCPR Enterprise on an on-going basis to ensure conduct in conformity with the goals of enterprise.

81.    Simply put, Allstate has retained and incorporated select law firms into the CCPR Enterprise for the purpose of maximizing profits to Allstate shareholders and executives.

## G. Acquisition of Encompass and Esurance

82.    Following implementation of the CCPR Enterprise, Allstate invested in and/or acquired two other large insurance companies: Esurance and Encompass.

83.    Esurance and Encompass were/are two of the largest automobile insurance providers in the country, thereby exponentially expanding the reach of the CCPR Enterprise.

84.    With control and ownership of Esurance and Encompass, and upon information and belief, Allstate redesigned Esurance's and Encompass' claim processing systems by shifting their cultures and incorporating them into the CCPR Enterprise, where they engaged in the same or similar fraudulent schemes of which Allstate and McKinsey designed, as explained above.

85.    As a result, Esurance and Encompass, through use of and participation in the CCPR Enterprise, also engaged in fraudulent acts so to further the express

purpose of the enterprise and maximize the profits for Allstate's shareholders and executives at the expense of their policyholders and medical providers.

## H. Michigan No-Fault Act

86.    Michigan has a system of mandatory no-fault automobile insurance which requires, among other things, that all Michigan drivers purchase "personal protection insurance" ("PIP").  Mich. Comp. Laws. Ann. §500.3101.

87.    "The Michigan No-Fault Insurance Act, which became law on October 1, 1973, was offered as an innovative social and legal response to the long *payment delays*, *inequitable payment* structure, and *high legal costs* inherent in the tort (or "fault") liability system.  The goal of the no-fault insurance system was to provide victims of motor vehicle accidents *assured, adequate, and prompt reparation* for certain economic losses."  *Shavers v. Kelly,* 402 Mich. 554, 267 N.W.2d 72 (1978).

88.    The No-Fault Act provides "for payment without regard to fault within 30 days of claim for all reasonable medical and rehabilitation expenses" where "[p]rompt payment provided for under the act" was required to remedy the delays that had been so prevalent under the tort system.  *Id.* at 623.

89.    Pursuant to MCL §500.3105(1) of the Act, an insurer is liable to pay for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle, subject to other provisions of the Act.

90.     Pursuant to MCL §500.3105(2) of the Act, PIP benefits are due under the Act without regard to fault.

91.     Pursuant to §500.3107(1)(a) of the Act, PIP benefits are payable for "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation."

## I.  Pattern and Instances of Unlawful Conduct; Defendants Targets Plaintiffs Through Utilization of the CCPR Enterprise

92.     Plaintiffs provide medical services to Defendants' insureds upon the fundamental premise that, if the services are covered by Defendant(s)  and are reasonable and necessary pursuant to MCL §500.3107 ("No-Fault Act" or "Act"), Plaintiffs will be compensated in a timely manner for providing those services.

93.     Defendants represent that it will pay medical providers in a timely manner for rendering medically necessary services pursuant to the Act to their insureds.  Defendants makes such representations in several ways, such as:

a. By providing their insureds plans or policies that medical providers will be compensated for rendering covered, medically necessary services as defined in the Act;

b. By providing insureds and medical providers with claim numbers;

c. By confirming coverage for medically necessary services when contacted prior to treatment;

d. By providing billing information to medical providers;

22

      e. By operating in Michigan, which requires timely payment pursuant to the Act.

94.    However, Defendants do not use the standard described in MCL §500.3107 as criteria for evaluating payment requests. Instead, consistent with its past organizational practice – as first introduced by McKinsey - in arbitrarily denying claims as described above to: 1) maximize profits for its shareholders and executives, 2) punish certain medical providers for providing any medical services to its insureds (irrespective of reasonableness or necessity of service), and 3) reduce payment of claims, pursuant to a predetermined protocol, Defendants routinely delay then deny nearly every claim submitted by Plaintiffs, simply because the claims were submitted by Plaintiffs, and without properly inquiring into the medical necessity or other standards prescribed by the Act.

95.    Defendants not only systematically deny claims submitted by Plaintiffs, they also intentionally and improperly delay processing of payment while representing that such payments are "pending investigation" (which they were not).

96.    Defendants, through use of the CCPR Enterprise, covertly and routinely delay and deny PIP reimbursement to Plaintiffs, based on reasons other than medical necessity and reasonableness of services, so to effectively allow Defendants and the CCPR Enterprise to gain increased use of funds owed to Plaintiffs.

97.    Defendants' scheme to defraud included, among other things, the making of misrepresentations to its insureds, and potential insureds, that the policies

23

purchased by insureds would provide coverage for all reasonable and necessary medical expenses that arise out of an automobile accident – even though Defendants did not intend to provide such coverage for certain medical providers, such as Plaintiffs.

98.     As part of its unlawful claim process procedure, Defendants improperly delay payments by sending to Plaintiffs, by the United States Mail, letters in which Defendants notify Plaintiff that an "investigation is pending", and informing Plaintiffs the claim in being reviewed pursuant "to the provisions of the policy under which the claim was made and applicable regulatory requirements.

99.     In furtherance of this scheme, Defendants issue through the United States Mail form "investigation letters" after receiving a claim for payment of benefits from Plaintiff, which often contain false and misleading information and statements as to the propriety of the charges sought to be paid to Plaintiffs.

100.    The purpose and/or effect of the "investigation letters" was to delay or preclude the payment of benefits due and owing under the Act, thus, misleading or continuing to mislead Plaintiffs into believing that such claims are actually "under investigation" for medical necessity, when in reality those letters served as a predicate for the later wrongful denial of the payment of benefits due and owing under the Act, pursuant to a predetermined protocol.

101.    Subsequent to the issuance of the purported "investigation letters", Defendants then utilize the United States Mail to issue predetermined explanation of benefits ("EOB") letters, which often contain false and misleading information and statements as to the propriety of the charges sought to be paid to Plaintiffs, in order to fraudulently deny the payment of benefits due and owing under the Act.

102.    These EOB letters routinely come after Plaintiffs' payment requests have been improperly denied and/or delayed under false pretenses.

103.    To date, and upon information and belief, every single payment request, or nearly every single payment request, submitted by Plaintiffs to Allstate have been delayed and then ultimately denied under false pretenses, and pursuant to a predetermined claims protocol since at least 2016 (or earlier) to the present.

104.    To date, and upon information and belief, every single payment request, or nearly every single payment request, submitted by Plaintiffs to Encompass have been delayed and then ultimately denied under false pretenses and pursuant to a predetermined claims protocol since at least 2016 (or earlier) to the present.

105.    To date, and upon information and belief, every single payment request, or nearly every single payment request, submitted by Plaintiffs to Esurance have been delayed and then ultimately denied under false pretenses and pursuant to a predetermined claims protocol since at least 2016 (or earlier) to the present.

106.   Through coded and/or shorthand explanations, and upon information and belief, the EOBs mailed to Plaintiffs misrepresent and/or conceal the actual manner in which Plaintiffs' payment requests were processed so as to prevent Plaintiffs from realizing the automatic and systematic method in which Defendants deny such claims simply because such claims were submitted by Plaintiffs.

107.   The systemic wrongful denial of benefits through the pattern of wrongful, fraudulent, bad faith, grossly negligent and malicious in fact claim processing procedure of Defendants and its co-conspirators, and use of the United States Mail system to facilitate the issuance of the above "investigation letters" and EOB letters, force Plaintiffs to either seek judicial relief for the payment of benefits which would otherwise be conferred under the Act and Michigan law or lose the payment of such benefits by operation of law.

108.   The above pre-determined pattern of claim processing procedure of placing virtually all claims submitted by Plaintiffs under "investigation" was a plan, policy, and/or pattern of activity by Defendants, through use of the CCPR Enterprise (particularly its adjusters, executives, affiliates, subsidiaries, and automated processing systems such as Colossus and MDP), to attempt to intentionally circumvent the provisions of the Act.

109.   By way of example, Allstate sends an investigation letter to Plaintiffs shortly after receiving a request for payment of a medical bill from Plaintiffs.  For

instance, in the case of one patient identified as RC, Allstate sent a letter on October 7, 2019, shortly after it received a claim for payment from Plaintiff Meds Direct on September 9, 2019, where Defendant Allstate represents that "*Allstate Insurance Company*" had "*investigated the claims made by you for treatment.*" Allstate then proceeded to provide a list of alleged reasons for why it has determined to deny coverage of the bill all together.

110. However, upon information and belief, the list provided various false reasons for denying coverage so to conceal and/or misrepresent the actual manner in which Allstate automatically processes and denies claims submitted by certain providers, like Plaintiffs. This particular letter was submitted by an Allstate agent by the name of Rebecca Bailey.[3] (see **Ex. S**, Bates 1209, Letters Sent by Defendants Through US Mail).

111. Shortly thereafter, and to continue on the example described above, Allstate then followed up with a letter where it represented that Allstate had "*reviewed the bill to make sure it is payable according to the provisions of the policy under which the claim was made and applicable regulatory requirements*" and

---

[3] A review of **Ex. S** identifies a handful of various agents and employees that participated in, and engaged in acts in furtherance of the CCPR Enterprise. See *Davis v. Mutual Life Ins. Co. of New York,* 6 F.3d 367, 379 (6th Cir. 1993.) (holding an insurance company liable as a "person" under RICO because of the actions of its agent (also a RICO "person")); *In re ClassicStar Mare Lease Litig.*, 823 F. Supp. 2d 599, 635 (E.D. Ky. 2011).

subsequently denied the claim and referred Plaintiff to view the "*Explanation of Benefits outlining the reasons for non-payment.*"  This letter was sent by an Allstate agent by the name of Catherine Marberg.  (**Ex. S**, Bates 1210).

112.   In furtherance of its scheme, and to continue on the example described above, Allstate then represents that payment was denied "*based upon the results of our investigation*" – even though, upon information and belief, no such proper investigation had been conducted, as required under the Act.  Further, Allstate also represents that the "request for payment *is on hold* pending a determination as to whether the submitted charges are reasonable, as requirement by MCL 500.3107(1)(a)" and "whether the services rendered to your patient were lawfully rendered, as required by MCL 500.3157."  (**Ex. S**, Bates 1211).

113.   Despite the false pretenses represented in the above paragraphs pertaining to RC, Allstate knowingly and intentionally failed to conduct a proper investigation to determine the reasonableness and necessity of the services rendered, and  denied the claims submitted by Plaintiffs, simply because such claims were submitted by Plaintiffs.  (**Ex. S**, Bates 1209-1218; see Bates 1218 – note the involvement of a third Allstate agent, Sheila Kostovski).

114.   This is one of many examples of Allstate using the US Mail to perpetrate its scheme of fraud through use of the CCPR Enterprise and which has caused the denials of all and/or nearly all claims submitted by Plaintiffs.

115. Another example is provided in **Ex. S**, Bates 1305, where Allstate again represents to Plaintiff Tox Testing that it had received its claim, and had "*reviewed the bill to make sure it is payable according to the provisions of the policy under which the claim was made and applicable regulatory requirements*" and that it determined that payment would not be made. The Explanation of Benefits attached contained another false and misleading representation that "*an investigation is pending.*" The Allstate agent involved in those misrepresentations was a Kenyanna Smith. (**Ex. S**, Bates 1306).

116. The claim above was denied in its entirety without a proper investigation, let alone one that was supposedly done "according to the provisions of the policy under which the claim was made and applicable regulatory requirements [i.e. the No-Fault Act]."

117. Additionally, and to provide another example, on or around December 27, 2018, Patient LR was involved in a motor vehicle accident when an underaged driver failed to yield. (**Ex. T** – LR Crash Report). Patient LR was insured through Allstate. On February 12, 2019, after Plaintiff Meds Direct sought reimbursement for medical services provided to Patient LR, Allstate issued an EOB placing the payment "on hold pending a determination as to whether the submitted charges are reasonable, as required by MCL 500.3107(1)(a)." On February 27, 2019, Allstate issued another EOB where it represented that the request for payment was "under

investigation." After substantially delaying reimbursement for reasonable and necessary services rendered to Patient LR, and without properly investigating the claim as falsely represented in EOBs and investigation letters, Allstate denied the entire claim.

118. Additionally, and to provide another example, on or around January 1, 2018, Patient JW was involved in a motor vehicle accident when his southbound traveling vehicle was struck by an eastbound vehicle that ran a red light, causing a chain reaction in which Patient JW's vehicle struck two other vehicles traveling northbound. Patient JW's vehicle was disabled and Patient JW was transported to Sinai Grace Hospital. (**Ex. U** – JW Crash Report). Patient JW was insured through Allstate. On March 12, 2018, after Plaintiff Paragon sought reimbursement from Allstate for medical services provided to Patient JW, Allstate issued an EOB placing the payment "on hold pending a determination as to whether the submitted charges are reasonable, as required by MCL 500.3107(1)(a)." On March 13, 2018, Allstate issued another EOB where it represented that the request for payment was "under investigation." On May 7, 2018, after substantially delaying reimbursement for reasonable and necessary services rendered to Patient JW, and without properly investigating the claim as falsely represented in EOBs and investigation letters, Allstate denied the entire claim.

119.   Additionally, and to provide another example, on or around October 25, 2016, Patient EA was a pedestrian crossing M-59 when "a large blue sedan" struck him, "*causing him to land on the hood of the vehicle then rolled off and landed on the pavement*."  The driver of the vehicle placed Patient EA in the backseat of the vehicle and transported him to St. Joseph Mercy Hospital Emergency Room.  Patient EA suffered a "broken left leg and several injuries to his arms and body."  (**Ex**. **V** – EA Crash Report).  The Michigan Assigned Insurance Placement Facility assigned Patient EA's claim to Allstate, pursuant to the Michigan Assigned Claims Plan.  On or around July 13, 2018, after receiving a bill for payment from Plaintiff, Allstate denied the claim.  On or around April 1, 2019, after receiving a request for reimbursement for treatment following Patient EA's accident, Allstate represented that the request for payment was "under investigation."  On or around April 25, 2019, after Plaintiff sought reimbursement for medical services provided to Patient EA, Allstate issued an EOB placing the payment "on hold pending a determination as to whether the submitted charges are reasonable, as required by MCL 500.3107(1)(a)."  After substantially delaying reimbursement for reasonable and necessary services rendered to Patient EA, and without properly investigating the claim as falsely represented in EOBs and investigation letters, Allstate denied the entire claim.

120.   As represented in **Ex. W**, which reflect most, if not all, of the submitted claims not timely paid by Defendants, Esurance and Encompass also engaged in the

same or similar delay then deny tactics to deny claims submitted by Plaintiffs, without proper review or investigation of the services rendered, as required by the Act.

121.   Attached as **Ex. S** are several more examples of Defendants using the US Mail in furtherance of its scheme of fraud, and in furtherance of the purpose of the CCPR Enterprise to maximize profits for shareholders and executives at the expense of policyholders and medical providers.

122.   Given the fact that Defendants have refused to voluntarily pay a single claim (i.e. without Plaintiffs having to initiate litigation, where Plaintiffs have successfully forced Defendants to pay on certain claims), upon information and belief, discovery will reveal hundreds more of such examples where no proper review or investigation of claims were made by Defendants (pursuant to their obligations under the Act) for submitted claims by Plaintiffs, despite making representations through US Mail to the contrary.

123.   This scheme of using the US Mail to perpetrate fraud on Plaintiffs by representing that such claims were being, or had been, properly investigated under the Act (when in reality they had not), is an example of predicate acts being taken, at the direction of Allstate, through the use of and with the participation of the CCPR Enterprise, which included participation and involvement of, among others,

Defendants' automated processing systems, adjusters, executives, affiliates, and subsidiaries.

124.   In many of these letters, Defendants make material misrepresentations to Plaintiffs, including, but not limited to, the fact that an "investigation is pending" and that the claim is being reviewed pursuant "to the provisions of the policy under which the claim was made and applicable regulatory requirements."

125.   Defendants then also send a letter shortly thereafter informing Plaintiffs that payment would be denied "based upon the results of our investigation" – even though Defendants had not properly investigated the claim as required by the Act.

126.   Given the fact that Defendants have not made one payment voluntarily to Plaintiffs, the truth is that they had already made a predetermination – or had a predetermined claims protocol – to delay and deny all claims submitted by Plaintiffs regardless of the validity of claims submitted.

127.   The truth is that the claims were automatically flagged (pursuant to their predetermined protocol to eventually deny all claims submitted by Plaintiffs) regardless of reasonableness or medical necessity and Defendants did not intend to, nor did they, investigate Plaintiffs' claims properly for reasonableness and necessity of service, as required under the Act.

128.   The result of Defendants' "investigation letters" is that payments are delayed well beyond the amount of time required by the Act, as well as the time set

by industry practice.  This allows Defendants significant float and increased access to funds, which Defendants use to persecute medical providers, by, for example, filing RICO claims against them.  This also wrongfully deprives Plaintiffs of the time value of their money, as well as the practical ability to treat patients injured in automobile accidents.

129.   In further targeting Plaintiffs and other medical providers, Defendants have also resorted to aggressive legal strategies to delay, and deny valid claims pursuant to the objectives of the CCPR Enterprise in maximizing profits for Defendants.

130.   For example, in 2012, using one of its pre-selected law firms, Defendant Allstate initiated a RICO action against certain medical providers including Plaintiff, GLASC.  The action was filed in Eastern District of Michigan (Case No. 12-13500). That case was settled.

131.   Over six years later, in 2018, Defendant Allstate, with other Defendants in this action (including Esurance) again initiated another bogus RICO action in the same federal court (Case No. 18-13336), using the same law firm, against Plaintiff GLASC, among other medical providers to coerce and deter Plaintiff, and certain medical providers from submitting claims to Defendants.

132.   Again, for both RICO actions that were brought 6 years apart against Plaintiff GLASC, Defendants used the same law firm.  Such a fact further

corroborates Plaintiffs' assertion that the CCPR Enterprise is composed of certain law firms that are retained by Defendants to aggressively target medical providers under false pretenses - so to deter Plaintiffs from submitting future claims for payment in addition to avoiding payment owed - which acts to further the purpose of the enterprise of punishing certain medical providers, and to maximize profits for Allstate's shareholders and executives at the expense of its policyholders and medical providers.

133.   A further illustration of how Defendants have wrongfully targeted Plaintiffs and other medical providers can be further illustrated below.

134.   For example, after providing medical services to Defendants' insureds who were injured in an automobile accident, Plaintiffs are required to submit a standard coded claim form.

135.   Plaintiffs, and other medical providers, rely on Defendants' express and implied representations that they will review each claim submitted pursuant to the policy and "applicable regulatory requirements" (the Act) and be paid for rendering covered, medically necessary services by providing those services.

136.   Rather than actually assessing the reasonable medical necessity of each claim submitted by Plaintiffs, Defendants, instead, through participation in the CCPR Enterprise, have systematically utilized its unlawful predetermined claim

processing procedures to delay and deny all payments to Plaintiffs using the protocols and techniques described herein.

137.   Such a scheme was reasonably calculated to deceive policyholders and Plaintiffs.

138.   Defendants, through use of the CCPR Enterprise, formed this scheme or artifice to defraud, mislead and deceive its insureds and medical providers, including Plaintiffs, and did so with specific intent to deceive, mislead or defraud them resulting in denial of every, or nearly every, claim submitted by Plaintiffs.

139.   Plaintiffs have been victimized by this scheme, as further described below.

140.   For example, with respect to Plaintiff **GLASC**, Allstate has fraudulently and/or improperly denied claims, totaling at least $1,747,558.00. Upon information and belief, not a single claim had been voluntarily paid by Defendants. Essentially, through the utilization of the CCPR Enterprise, Allstate summarily and wrongfully deemed that all claims submitted by GLASC were either fraudulent and/or were not reasonable and necessary medical services provided to Allstate's insureds, to require reimbursement under the Act. (**Ex. S**; **Ex. W**)

141.   Similarly, with respect to **GLASC**, and through use of the CCPR Enterprise, Defendant Encompass summarily denied claims totaling at least

$236,159.00, and, Defendant Esurance denied claims of at least $2,772,248.00. (**Ex. S**; **Ex. W**).

142.   With respect to Plaintiff Meds Direct, Allstate has fraudulently and/or improperly denied claims totaling at least $2,153,547.00. Upon information and belief, not a single claim had been voluntarily paid by Defendants. Essentially, through the utilization of the CCPR Enterprise Allstate summarily and wrongfully deemed that all claims submitted by Meds Direct were either fraudulent and/or not reasonable and necessary medical services provided to Allstate's insureds, to require reimbursement under the Act. (**Ex. S**; **Ex. W**).

143.   Similarly, with respect to Meds Direct, and through use of the CCPR Enterprise, Encompass summarily denied claims totaling at least $63,807.38, and Esurance denied claims totaling at least $1,262,541.00. (**Ex. S**; **Ex. W**).

144.   With respect to Plaintiff Tox Testing (aka Paragon), Allstate has fraudulently and/or improperly denied claims totaling at least $2,663,199.00. Upon information and belief, not a single claim had been voluntarily paid by Defendants. Essentially, through the utilization of the CCPR Enterprise, Allstate summarily and wrongfully deemed that all claims submitted by Tox Testing were not reasonable and necessary medical services provided to Allstate's insureds, to require reimbursement under the Act. (**Ex. S**; **Ex. W**).

145.   Similarly, with respect to Tox Testing (aka Paragon), and through use of the CCPR Enterprise, Encompass summarily denied claims totaling at least $74,708.00, and Esurance denied claims totaling at least $1,206,331.00.  (**Ex. S**; **Ex. W**).

146.   Although the patients varied, the purpose of each correspondence (i.e. investigation letters, EOBs) from Defendants to Plaintiffs  was similar or the same (to mislead Plaintiffs into believing that the claims were being properly reviewed or investigated for medical necessity as required by the Act), the result was the same (nearly every, if not all, claims were delayed then denied), the participants were the same (Defendants, through their agents, at the direction of their executives, and with the aid of CSC's, or its successor, and Mitchell's automated processing systems, or its successor), and the method of commission was the same (delay of payment under false pretenses through use of mail, and then denial of payment under false pretenses by use of mail).  In other words, although Defendants' scheme involved various patients, the predicate acts and manner of execution are not isolated, but instead reflect a pattern of racketeering over a substantial period of time.

147.   Defendants, utilizing their fraudulent pre-planned claim processing protocol of blanket denials, have artificially and wrongfully deprived Plaintiffs of reimbursement pursuant to the Act.

148.    As a result of the wrongful, fraudulent, bad faith, and tortious behavior of Defendants and their co-conspirators and accomplices, Plaintiffs are forced to initiate litigation in order to obtain the payment of benefits that are otherwise legally payable under the Act.

149.    As a direct and proximate result of the wrongful actions of Defendants, and its co-conspirators and accomplices as stated above, Plaintiffs have suffered and will continue to suffer damages and economic losses.

## The Need for Declaratory and Injunctive Relief

150.    Defendants' unlawful pattern of processing claims to automatically delay and deny payments to medical providers who treat their insureds is an ongoing problem that will continue to cause Plaintiffs economic losses and threaten their ability to provide medical services to the public.

151.    A money judgment in this case will only compensate Plaintiffs for past losses.  It will not stop Defendants' interference in medical treatment decisions, and it will not stop Defendants from continuing to confiscate the money Plaintiffs earn, which is necessary to maintain their practices.

## RICO Allegations

152.    RICO is a broadly worded statute that "has as its purpose the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce." S. Rep. No. 91-67, at 76 (1969).

153.   Plaintiffs are "persons" within the meaning of 18 U.S.C. §1961(3).

154.   Defendants are each, both a "person" and one of the members of the enterprise. 18 U.S.C. 1962(c)

155.   Defendants' agents, owners, shareholders, directors, and executive members are also each considered RICO enterprise persons distinct from Defendants for purposes this case.  *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158 (2001).

156.   In the normal course of business, Defendants provide a variety of services including, auto insurance, home insurance, renters insurance, condo insurance, motorcycle insurance, business insurance, life insurance, roadside insurance, identify insurance, boat insurance, motorhome insurance, snowmobile insurance, ATV insurance, pet insurance, event insurance, landlord insurance, retirement & investment insurance, and more.

157.   The association-in-fact enterprise, or the CCPR Enterprise, conducts activities beyond and distinct from Defendants' normal affairs of providing insurance coverage by instead, conducting affairs that work to delay, deny, and diminish payments involving automobile accidents in no-fault states, such as Michigan.

158. Based on Plaintiffs' current knowledge, the following persons constitute a union or group of individuals associated-in-fact that Plaintiffs refer to as

the "CCPR Enterprise": 1) Allstate; 2) Esurance; 3) Encompass; 4) Allstate's, Esurance's, and Encompass' subsidiaries and affiliates operating or located in Michigan; 5) Allstate's, Esurance's, and Encompass' agents and claim representatives; 6) Allstate's, Esurance's, and Encompass' executives and decision makers; 7) Computer Sciences Corporation and/or its successor; 8) Mitchell International and/or its successor ; 9) certain IME doctors retained by Defendants (some known, some unknown at this time); 10) certain IME Companies retained by Defendants (some known, some unknown at this time); 11) certain law firms retained by Defendants (some known, some unknown at this time); 12) McKinsey Consulting, and 13) other unidentified claim processing and printing corporations/entities/persons.

159.   The above-referenced entities and individuals constitute an associated-in-fact enterprise because they engage(d) in conduct spanning several years with the common purpose of increasing profits for Allstate, and its shareholders and executives.

160.   The above-referenced entities (which includes Defendants) forged symbiotic relationships and needed and depended upon the participation of the others to accomplish their common purpose of defrauding insureds and medical providers, such as Plaintiffs, through fraudulent tactics to delay, deny, and diminish legitimate claims for reimbursement.

161. The establishment of the CCPR Enterprise, and the participation and role of each member, was/is necessary to the success of Defendants' scheme to defraud insureds and medical providers, such as Plaintiffs.

162. The CCPR Enterprise is an organization which engages in, and whose activities affect, interstate commerce.

163. While the members of the CCPR Enterprise participate in and are members and part of the enterprise, they also have an existence separate and distinct from the enterprise.

164. These entities participate in the associated-in-fact enterprise but are separable from each other.

165. Each member of the enterprise has its own purpose and structure separate from the enterprise which was formed for the purposes of decreasing Allstate's obligation to pay for medical expenses owed to insureds or medical providers, such as Plaintiffs.

166. Each and every member of the enterprise worked together, in collaboration with and/or at the direction of Allstate, for decades to further the purpose of the enterprise through changes made in the corporate culture and processing of claims with the goal of maximizing profits for shareholders and executives at the expense of policyholders and medical providers, such as Plaintiffs.

167.   In pursuing and executing this goal, the enterprise has and continues to function as a whole continuing unit working alongside and in conjunction with one another, and/or at the direction of Allstate.

168.   The members of the enterprise function as interdependent and coordinated associations that participate to perpetuate the enterprise and its profitability.

169.   This enterprise is a system that allows Defendants delay, deny, and diminish payments owed to certain medical providers, such as Plaintiffs, with the purpose of maximizing profits for Allstate's shareholders and executives.

170.   In order to retain monies owed to Plaintiffs in the manner set forth above, Defendants need a claim processing system that allows it to identify, screen, and prevent reimbursements to Plaintiffs and to conceal the manner in which that is done.

171.   This enterprise is a system that allows Defendants to conceal the manner in which certain medical providers', such as Plaintiffs', claims are processed and automatically delayed and denied for reasons other than whether services provided to certain insureds were medically reasonable and necessary.  (See **Ex. K**– *Genord v. Blue Cross and Blue Shield of Michigan,* Case No. 03-CV-72950-DT, (E.D. Mich. 2004)).

172.   Allstate created, controls, manages, operates and directs the conduct of the enterprise so to systematically and automatically ban certain medical providers, such as Plaintiffs, from receiving timely reimbursements for providing medical services to those in automobile accidents.

173.   The enterprise was structured so that Defendants, along with its executive leadership, directed and supervised the pattern of racketeering activities by directing and supervising the creation of, use and mailing through the United States Postal System of deceptive, fraudulent, and misleading "investigation" letters, objection letters, and EOBs.

174.   At all times relevant herein, all Defendants, and each of them, were the agents, servants, employees, co-conspirators or joint venturers of their co-defendants, and were subsidiaries, divisions or affiliates of the Allstate Corporation and that in doing the acts herein alleged were acting within the course and scope of said agency, employment, conspiracy , joint venture, subsidiary or affiliated relationship with the advance knowledge, acquiescence or subsequent ratification of each and every remaining defendant and the Allstate Corporation.  Each and every Defendant was acting either as a principal of each and every other Defendant or as an agent, servant, employee, co-conspirator or joint venturer.

175.   Allstate, as a RICO "person" and a member of the enterprise, controls, conducts, supervises, influences, participates, coordinates, instructs, and/or directs

the affairs of the enterprise, which involve the pattern of racketeering as described herein.

176. In addition to foregoing, Allstate also controls and operates the enterprise as follows:

    a. By leasing, using, and/or manipulating automated processing systems (such as Colossus and MDP, or its successors) to identify certain claims, such as those submitted by Plaintiffs, to systematically deny those claims without regard to medical necessity or the standard under MCL §500.3107;

    b. By requiring its agents, affiliates, and subsidiaries to delay and deny claims for timely reimbursement under false pretenses;

    c. By printing and mailing false and fraudulent letters to Plaintiffs to mislead them into believing that their claims are being investigated, and are being evaluated under the terms of the policies, and applicable regulations (i.e. No-Fault laws).

### Predicate Acts

177. Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 USC §1341 (relating to mail fraud). As set forth herein, Defendants, through operation and management of the CCPR Enterprise, engaged in conduct violating this law to effectuate its scheme and further the purpose of the enterprise.

178. As set forth herein, Defendants directed the enterprise's affairs, by among other things, making decisions on behalf of the enterprise and/or knowingly carrying out the affairs of the enterprise.

179. For the purpose of executing and/or attempting to execute the above described claim processing scheme to defraud or obtain money by means of false pretenses, representations, or promises, Defendants, through participation in the CCPR Enterprise, and in violation of 18 U.S.C. §1341, placed in post offices and/or authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to agreements, manuals, correspondences, patient lists, payments, EOBS, reports, data, summaries, statements, and plan materials.

180. The matter and things sent by Defendants via the Postal Service and/or commercial carrier include:

    a. Material containing false and fraudulent misrepresentations that Defendants would pay its insureds and/or Plaintiffs for the covered, medically necessary services they provided to Defendants' insureds when in fact there was already an existing predetermined protocol or predetermined claims processing system established to deny claims submitted by Plaintiffs;

    b. Material containing the false and fraudulent misrepresentations that Defendants have not yet made a decision regarding payment and was investigating Plaintiffs' payment requests when in fact there was already an existing predetermined protocol or predetermined claims processing system established to deny claims submitted by Plaintiffs;

    c. Material containing the false and fraudulent misrepresentation that Defendants were doing anything to actually investigation Plaintiffs' payment requests when in fact there was already an

existing predetermined protocol or predetermined claims system established to deny claims submitted by Plaintiffs;

d. Material which concealed or failed to disclose that Defendants would and did use the techniques and procedures described herein to deprive Plaintiffs of payment, including automatic denials and deliberate and unjustified delays of payment.

e. Materials constituting explanations for payments made or denied by Defendants, but which, in fact, fail to reveal and/or actively conceal the reasons that payment has been denied, diminished, or delayed.

f. Other matters and things sent through or received from the Postal Service, by Defendants or their co-conspirators or accomplices that included information or communications in furtherance of or necessary to effectuate the scheme.

181. Such false representations are necessary in order for Defendants to conceal the fact that it has a predetermined protocol or a predetermined claims protocol that systematically delays, denies, and diminishes claims submitted by certain medical providers (such as Plaintiffs), simply because those claims were submitted by those providers, irrespective of whether the claims were legitimate under the Act.

182. Defendants' acts of concealment, and failure to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiffs and the insureds and obtaining their property for the enterprise's gain.

183.   Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Plaintiffs relied on the misrepresentations and omissions as set forth herein.

184.   As a result, Defendants and its co-conspirators and accomplices have obtained money and property belonging to Plaintiffs, and Plaintiffs have been injured in their business and property by Defendants' overt acts of mail fraud, and by their aiding and abetting each other's acts of mail fraud.

## Pattern of Racketeering

185.   Defendants, through participation in and management of the CCPR Enterprise, engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. §1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e. indictable violations of 18 U.S.C. §§1341 as described above, within the past ten years.   In fact, Defendants, through use and participation in the CCPR Enterprise, has committed or aided and abetted in the commission of hundreds of acts of racketeering activity.   Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiffs and insureds.

186.   The multiple acts of racketeering activity, as described herein, which Defendants committed and/or conspired to or aided and abetted in the commission

of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. §1961(5).

187. Further, Plaintiffs have been the victims of the multiple acts of racketeering activity, described herein, since at least 2016 until now, and with no reason to believe that such conduct will cease at any point in the near future.

188. In other words, there is a threat that this pattern of racketeering activity will continue indefinitely so long as Plaintiffs treat patients insured by Defendants.

189. Examples of predicate acts committed by Defendants, through the CCPR Enterprise, and pursuant to their scheme to defraud Plaintiffs in violation of RICO are set forth herein and the attached exhibits.

## COUNT I
## RICO CLAIMS

190. Plaintiffs incorporate herein by reference each and every paragraph above as though fully set forth herein.

191. The statutory entitlement to receive payment for PIP benefits, including but not limited to costs associated with medical treatment that are reasonable and necessary. The Act both confers entitlement to PIP benefits and limits the discretion of insurers, like Defendants. to deny or rescind such benefits.

192.   The statutory entitlement to receive payment for PIP benefits, including but not limited to costs associated with medical treatment, constitutes property under both Michigan and Federal law.

193.   The fraudulent pattern of processing claims submitted by Plaintiffs – on behalf of insureds who were provided medical care, and executed assignments in favor of Plaintiffs – resulted in denials and/or refusals of Defendants to pay Plaintiffs for the costs of medical treatment provided to their patients (Defendants' Insureds) as part of PIP benefits under the Act and deprived Plaintiffs of, and injured, their businesses and their property.

194.   In particular, such fraudulent pattern of processing claims submitted by Plaintiffs resulting in denials and/or refusals of valid claims under the Act forced Plaintiffs to provide treatment for which compensation was not paid nor received, and further caused them to incur attorney fees as a direct result thereof.  These injuries to Plaintiffs' businesses and property were by reason of the RICO violations of Defendants', as set forth herein.

195.   The injuries to Plaintiffs' business and property were a substantial and foreseeable cause of Defendants' fraudulent actions, as described herein.

196.   Each and every one of Defendants, as well as other accomplices, some known and others currently unidentified to the Plaintiffs, knew, and agreed with one-another to commit, the underlying RICO predicate acts and/or participate in the

wrongful pattern of processing claims – under a predetermined protocol directed towards Plaintiffs – in order to deny Plaintiffs of their ability to engage in interstate commerce, and maintain their businesses and properties.

197.   The RICO enterprise consist of the CCPR Enterprise (as defined above), as well as other accomplices, some known and others currently unidentified to Plaintiffs, who associated together and/or acted in concert with one another for the common purpose of engaging in a course of conduct; that being to deny Plaintiffs of their properties, businesses, and their ability to engage in interstate commerce under a predetermined protocol directed towards Plaintiffs.

198.   It was the scheme of Defendants', to utilize an unlawful pattern of processing claims to deny Plaintiffs their ability to engage in interstate commerce, their businesses, and their properties by engaging in a wrongful pattern of processing under a predetermined claims protocol directed towards Plaintiffs, and denying claims submitted by Plaintiffs.  This goal was accomplished through a common scheme to take an unlawful action against Plaintiffs. *In re Managed Care Litigation,* 298 F.Supp.2d 1259 (S.D. FL 2003).

199.   Each individual Defendant is a business engaged in interstate commerce, and is doing business in many states.[4]

---

[4] Major property and casualty insurer doing business in many states was an "enterprise affecting interstate commerce" within meaning of RICO. *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546 (1st Cir. 1994).

200.   GLASC is a business engaged in interstate commerce, and have had several claims wrongfully and/or improperly denied by Defendants under a predetermined claims protocol, totaling at least $4,755,966.00, as further exemplified in **Ex. W**.

201.   Meds Direct is a business engaged in interstate commerce, and have had several claims wrongfully and/or improperly denied by Defendants under a predetermined claims protocol, totaling at least $3,479,896.00, as further exemplified in **Ex. W**.

202.   Tox Testing is a business engaged in interstate commerce, and has had several claims wrongfully and/or improperly denied by Defendants under a predetermined claims protocol, totaling at least $3,944,238.00, as further described in **Ex. W**.

203.   The CCPR Enterprise and their accomplices, both those named herein and those currently unknown to Plaintiffs, constitute an enterprise which was and is engaged in interstate commerce, and its actions and activities described herein affect and affected interstate commerce.

204.   18 U.S.C. §1961 defines racketeering activity to include any act indictable under, among other statutes, 18 U.S.C. §1341 (mail fraud).

205.   Plaintiffs were injured by reason of Defendants' conspiracy to engage in a scheme through use of US Mail to defraud Plaintiffs, by among other ways,

delaying and denying nearly every payment submitted by Plaintiffs to either one of the Defendants.

206.   Though the use of the US Mail, Defendants aided and abetted one another to engage in the above-referenced scheme to delay and deny payments submitted by Plaintiffs, in order to further the purpose of the CCPR Enterprise and maximize profits for Allstate's shareholders and executives at the expense of policyholders and medical providers, such as Plaintiffs.

207.   Defendants implemented a scheme of fraud to delay, deny, and diminish payments, by sending false and fraudulent "investigation" letters, EOBS and other correspondences through the US mail.

208.   Defendants contemplated and intended to use the mail to execute such a scheme.

209.   The use of mail resulted in furtherance of the scheme, which further induced medical providers, such as Plaintiffs, to form the impression that submitted claims were being properly evaluated for medical necessity, as required by the Act.

210.   Defendants used the mail system or caused the mail system to be used in order to execute its fraudulent scheme.

211.   Defendants knew or should have known that the use of mail would follow in the ordinary course or business, or that it was reasonably foreseen, in order to perpetuate the fraud on Plaintiffs.

212.   Defendants knew or should have known that the mailing of investigation letters, EOBs, and other correspondences were essential to its scheme.

213.   Sending investigation letters, EOBs, and other correspondences are part of a regular way of conducting Defendants' ongoing legitimate business.

214.   However, the investigation letters, EOBs, and other correspondences sent to Plaintiffs were premised on and/or contained misrepresentations, omissions and false promises which appeared legitimate on their face but were not.

215.   The legitimate business or part of the legitimate business of each Defendant was regularly conducted by fraudulently denying benefits to Plaintiffs – mainly pursuant to a predetermined claims protocol - by the use of  mail.

216.   Also, as a result of Defendants fraudulent concealment of this predetermined claims protocol, Plaintiffs reasonably assumed that Defendants were complying with their ethical obligation to act honestly and with integrity, and in compliance with the No-Fault Act.

217.   As such Plaintiffs could not have discovered the extent of Defendants' fraudulent scheme (i.e. predetermined protocol, targeting medical providers with RICO claims, sending fraudulent letters by US Mail) until it was able to 1) compile and review the hundreds of bills and documentations together, and 2) be subject to an second similar RICO suit,  thereby further revealing Defendants' established and predetermined claims processing protocol towards Plaintiffs.

218.   Successful execution of the scheme was dependent on the investigative letters, EOBs, and other correspondences sent to Plaintiffs, as it functioned to delay then deny claims in a manner that concealed Defendants'  predetermined claims protocol - to blanketly deny any and all claims submitted by Plaintiffs - irrespective of whether Plaintiffs provided reasonable and necessary medical services to its insureds.

219.   Defendants' misrepresentations, omissions, and false promises were intended to or had the effect of  lulling Plaintiffs into inaction, by appearing on its face to represent that Plaintiffs' submissions were being properly investigated for medical necessity, when reality such submissions were not being properly investigated and actually denied based on a predetermined claims protocol directed towards Plaintiffs – without any regard to the whether such treatment was reasonable or medically necessary for the insured.

220.   Each and every investigation letter, objection letter, EOB or other correspondence sent by Defendants to Plaintiffs is related in the sense that they all occurred, grew out of, or were in furtherance of the herein described scheme to defraud and deceive policyholders and medical providers, such as Plaintiffs.  *In re Managed Care Litigation,* 2004 WL 7334075 (S.D. Florida 2004).

221.   Each and every investigation letter, objection letter, EOB, or other correspondence sent by Defendants to Plaintiffs evinced a desire to process

Plaintiffs' submission in good faith and in the regular manner as required under the Act, when in fact, no such intent actually existed.

222. Through use of the US mail, Defendants have acted intentionally, or with reckless indifference to the truth or falsity of their representations.

223. Through use of the US mail, and pursuant to a predetermined claims protocol, Defendants sent letters and EOBs containing outright lies and/or half-truths which included the documents attached hereto as **Ex. S**.

224. Through use of the US mail, upon information and belief, and given that nearly every claim submitted by Plaintiffs had been denied since 2016 (or earlier), Defendants sent letters and EOBs – pursuant to predetermined claims processing protocol –which improperly and/or intentionally omitted and/or conceal material facts, including: 1) Defendants had leased, used and/or purchased automated claims systems designed to systematically and automatically flag and ultimately delay then deny any and all claims submitted by certain providers; 2) no proper investigation regarding reasonableness and medical necessity (as required under the No-Fault Act) actually occurs when claims are submitted by certain providers, such as Plaintiffs,; 3) claims submitted by Plaintiffs were automatically going to be denied without regard to reasonableness or necessity of medical treatment; and 4) Plaintiffs' claims were being processed and denied by an automatic claims processing system which had been programmed by Defendants to delay then

deny any claims submitted by Plaintiffs without regard to reasonableness or necessity of medical treatment provided to its insureds, etc.

225.   Defendants used the mail to provide fraudulent objection letters, investigation letters, and EOBs, with the intent to and/or had the effect of, deceiving Plaintiffs of the fact that such letters were "business-as-usual" when, in fact, all of the letters were merely part of a preplanned scheme to defraud Plaintiffs by delaying and ultimately denying all claims – without any proper review or investigation, as required under the Act.  Such actions are criminal pursuant to 18 U.S.C. §1341.

226.   The criminal acts described above have had the same or similar purposes, results, participants, victims, or methods of commissions or otherwise are interrelated and are not isolated events.

227.   Injury to Plaintiffs' property and business was not just incidental to Defendants' scheme, it was the object of the scheme.

228.   The predicate acts of mail fraud, as described throughout this Complaint and in the Exhibits attached hereto, contrary to 18 U.S.C. §1341, were committed by and on behalf of the enterprise and in furtherance of the RICO scheme.

229.   Based on the foregoing RICO predicate acts, a pattern of racketeering activity has occurred, including the commission of at least two (2) acts of racketeering activity within the previous ten (10) years.

230.   Plaintiffs have been injured in their business or property by Defendants' use of an unlawful pattern of processing claims pursuant to a predetermined claims processing protocol.

231.   Defendants, as well as other accomplices, some known and others currently unidentified to Plaintiffs, have also, through their racketeering enterprise, directly and proximately caused Plaintiffs significant damages to their businesses, to their property, and to their professional reputations, as well as attorney fees and other costs set forth in the damage count above.

232.   18 U.S.C. §1964 provides for civil remedies when a person is injured in his business or property by reason of a violation of 18 U.S.C. §1962, including the recovery of treble damages, cost of the suit, and reasonable attorney fees.  In addition, Plaintiffs may also recover the additional remedies set forth in subparagraph (a), (b) and (d) of 18 U.S.C. §1964.

**WHEREFORE** Plaintiffs seek judgment against Defendants, pursuant to 18 U.S.C. §1964, in addition damages, costs, and attorney fees, and other relief available under the Act.

## COUNT II
## DECLARATORY AND INJUNCTIVE RELIEF
## PURSUANT TO NO-FAULT ACT

233.   Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

234.   Defendants' unlawful pattern of processing claims to automatically delay and deny payments to medical providers who treat their insureds is an ongoing problem that will continue to cause Plaintiffs economic losses and threaten their ability to provide medical services to the public.

235.   A money judgment in this case will only compensate Plaintiffs for past losses.  It will not stop Defendants' interference in medical treatment decisions, and it will not stop Defendants from continuing to confiscate the money Plaintiffs earn, which is necessary to maintain their practices.

**WHEREFORE**, pursuant to the No-Fault Act, Plaintiffs seek Declaratory Relief regarding their right to payments of outstanding claims, as well as Injunctive Relief to prevent Defendants from continuing to engage in fraudulent claim processing acts, as described here in.  *see Estate of Lyle v. Farm Bureau General Insurance,* 2019 WL 4555993 (MI Ct. of Appeals 2019); (**Ex. K**).

## COUNT III
## DECLARATORY RELIEF AS TO VIOLATION OF THE MICHIGAN UNFAIR TRADE PRACTICES ACT

236.   Plaintiffs incorporate by reference the foregoing paragraphs as though fully set forth herein.

237.   Pursuant to MCL §500.2006 of the Michigan Unfair Trade Practices Act, a person must pay on a timely basis to its insureds, to an individual or entity directly entitled to benefits under its insured's contract of insurance, or to a third-

party tort claimant, the benefits provided under the terms of its policy, or, in the alternative, the person must pay to its insured, an individual or entity directly entitled to benefits under its insured's contract of insurance, or a third-party tort claimant 12% interest, as provided in MCL §500.2006(4) on claims not paid on a timely basis. Failure to pay claims on a timely basis or to pay interest on claims as provided in MCL §500.2006(4) is an unfair trade practice unless the claim is reasonably in dispute.

238.   The requests for payment by Plaintiffs to Defendants are routinely and unfairly denied without regard to medical necessity.

239.   Pursuant to MCL §500.2014(b), unfair methods of competition and unfair or deceptive acts or practices in the business of insurance include making a false entry of material fact in a book, report, or statement of a person engaged in the business of insurance or omitted to make a true entry of a material fact pertaining to the business of the person in a book, report, or statement of the person.

240.   Pursuant to MCL §500.2026(1), unfair methods of competition and unfair or deceptive acts or practices in the business of insurance, other than isolated incidents, are a course of conduct indicating a persistent tendency to engage in that type of conduct, and include:

  a.  Misrepresenting pertinent facts or insurance policy provisions relating to coverage at issue;

b. Failing to acknowledge promptly or to act reasonably and promptly upon communications with respect to claims arising under insurance policies;

c. Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

d. Refusing to pay claims without conducting a reasonable investigation based upon available information;

e. Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

*****

l. Delaying an investigation or payment of claims by requiring an insured, claimant, or the physician of either to submit a preliminary claim report and then requiring subsequent submission of formal proof of loss forms, seeking solely the duplication of a verification;

m. Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or the offer of a compromised settlement.

241. Pursuant to MCL §500.2118(1), as a condition of maintaining its certificate of authority, an insurer shall not refuse to insure, refuse to continue to insure, or limit coverage available to an eligible person for automobile insurance, except in accordance with underwriting rules established pursuant to that section and MCL §§ 500.2119 and 500.2120.

242. Defendants violated each of the statutory provisions above.

243. There is no basis under MCL §§ 500.2118, 500.2119, or 500.2120 for Defendants to summarily withhold and eventually deny all payments for medical expense PIP benefits in the fashion that it has with regard to these Plaintiffs.

244.   Defendants' illegal, wrongful, grossly negligent, bad faith and malicious in fact actions as described above demonstrate a complete disregard for its obligations as an insurer pursuant to statutory provisions set forth herein.

**WHEREFORE**, Plaintiffs seeks declaratory judgment deeming the actions of Defendants, as referenced above, to be unlawful, and award Plaintiff's a 12% penalty interest on the outstanding claims as permitted by the Michigan Uniform Trade Practices Act.  *State Farm Mut. Auto. Ins. Co. v. Physiomatrix*, Inc., No. 12-11500, 2013 WL 509284, at *9 (E.D. Mich. Feb. 12, 2013) on reconsideration, No. 12-11500, 2013 WL 3777108 (E.D. Mich. May 22, 2013), plus other relief to Plaintiffs that is just and equitable in addition to costs and attorney fees.

<u>**COUNT IV**</u>
**BREACH OF CONTRACT**

245.   Plaintiffs have conducted reasonable and necessary medical services for various patients insured by Defendants.

246.    Pursuant to Defendants insurance policy with its insureds, Defendants are obligated to pay for its insureds' reasonable and necessary medical services.

247.   Defendants' insureds – through their medical providers (Plaintiffs) – submitted their bills to Defendants for payment of the reasonable and necessary medical services received at Plaintiffs' facilities.

248.   Defendants intentionally delayed then denied payment of nearly every one of those bills, despite it being contractually obligated to pay for such services.

249.   Consistent with MCL 500.3143, Defendants' insureds have executed assignments to Plaintiffs so Plaintiffs can pursue their breach of contract claims on their behalves pursuant to each insured's automobile insurance policy.

250.   To date, Defendants have failed, refused, and/or neglected to pay, and is expected to fail, refuse, and/or neglect to pay, pursuant to its obligations under the insurance contracts, to pay for reasonable and necessary medical services conducted by Plaintiffs.

251.   A summary of submitted claims by Plaintiffs, and improperly denied by Defendants – subject to adjustment and including claims submitted within the last year - can be found in **Ex. W**.[5]

252.   Not a single claim submitted by Plaintiffs has been voluntarily paid.

253.   Defendants have breached their duties under their insureds' contracts for not paying timely.

**WHEREFORE**, Plaintiffs respectfully requests that this Honorable Court **GRANT** Plaintiffs' requested relief, including, but not limited to, whatever amount Plaintiffs are found to be entitled to, plus interest, damages for mental and emotional distress, together with costs and attorney fees and exemplary damages.

---

[5] Names and Addresses of Insureds have been redacted for privacy purposes. However, upon request, Plaintiffs will provide Defendants an unredacted copy.

Respectfully Submitted,

AKEEL & VALENTINE, PLC

By:/s/:  SHEREEF AKEEL
    Shereef H. Akeel (P54345)
    Adam S. Akeel (P81328)
    Attorneys for Plaintiff
    888 West Big Beaver Road, Suite 420
    Troy, MI  48084

Date:  February 10, 2020

O:\Angelo\@Allstate-Rico Claim\Pleadings-draft\Complaint and Jury Demand.docx